LPETERS, Judge.
This appeal arises from a trial court judgment terminating the parental rights of R.K. and J.K., the natural parents of two minor children, K.K. and C.K. While the judgment terminated the parental rights of both parents, only the mother, J.K., has appealed.
DISCUSSION OF THE RECORD
This litigation began when, on March 26, 1997, Cheryl James, a Child Protection Investigator for the State of Louisiana, Department of Social Services, Office of Community Services (OCS), sought. and obtained an oral instanter order from a judge of the Fourteenth Judicial District Court, Calcasieu Parish, Louisiana, to take K.K. and C.K. into protective custody.
The record reveals that R.K. and J.K. were in a relationship for approximately eight years prior to January 1997, the last five being with the benefit of marriage. C.K., a male child, was born July 21, 1991, and K.K., a female child, was born November 2, 1992. According to J.K., R.K. began abusing her the day they were married. Unfortunately, the children often witnessed this abuse.
J.K. obtained several restraining and protective orders against R.K. and attempted to have him arrested for the abusive behavior on numerous occasions. However, according to J.K., R.K. often violated the restraining and protective orders. J.K. testified that, on several occasions, the sheriffs department would not pick her husband up when he violated the court orders or when she complained of his abuse.
On January 22, 1997, R.K. again became abusive toward J.K., but she was able to escape from him to the Calcasieu Women’s Shelter. She left the children with R.K., intending to return for them the next day. *118 However, when she did return, neither R.K. nor the children were present in the home. Some two weeks later, R.K. | ^telephoned J.K. and informed her that he had hurt the children. Later, he telephoned again and informed her that he had killed them. Actually, R.K. had spanked the children with a paint stick sufficiently hard to leave bruises.
Following the spanking incident, the children were returned to J.K. at the Cal-casieu Women’s Shelter, and she and the children eventually went to stay with a friend. According to J.K., despite having a restraining order issued against him, three or four times a week R.K. would enter the property where she and the children were staying. On one night alone, R.K. was caught on the property seven different times. J.K. testified that “the law” would not pick up R.K., always using the excuse of lack of space in the jail. Because of law enforcement’s unwillingness to help her keep R.K. away and based on law enforcement’s advice, J.K. called child protection services in March of 1997. It was this telephone call that brought Ms. James and OCS into the difficulties. It is not disputed that J.K. voluntarily contacted child protection services and voluntarily surrendered her children for their protection.
Ms. James alleged the following in part in her affidavit in support of her request for the instanter order for custody:
That there is good cause to believe that said children cannot adequately be protected from the following dangers or harms if the children remain in parental custody:
Bruises, Dependency and Passive Abuse: based on the fact that the father, [R.K.] spanked the children with a paint stick and left bruises on their buttocks and he does not have the ability to care for the children due to chemical abuse and/or mental illness. Passive Abuse on the part of [J.K.] as she is not able to protect the children from further harm by the father and herself. Further, [J.K’s] mental state has deteriorated drastically in the last few months.
That the following services have been offered to prevent the necessity of removal, to no avail, or, alternatively, the following circumstances exist which indicate that there is a substantial, immediate danger to the children which precludes provision of preventive services as an alternative to removal and that it is contrary to the children's welfare to remain in the home:
IsThe agency contacted relatives in an effort to locate relative resources. The paternal grandmother stated she did not want to get involved. The agency were [sic] unable to locate relatives in Texas.
After issuing the oral instanter order, the trial court set a continued custody hearing for April 1, 1997. At the April 1 hearing, the state filed a petition “requesting] that the said children are Physically Abused and Neglected Children in Need of Care ... and further, that a date and time should be fixed by this Court for a hearing on this matter.” The court signed an order on the same date fixing a hearing on the petition for May 1, 1997.
Despite setting the hearing on the petition for May 1, the continued custody hearing on April 1 not only resulted in an order maintaining custody with OCS, but also in a judgment adjudicating the children as “Physically Abused and Neglected Children in Need of Care, pursuant to Title VI of the Louisiana Children’s Code, and by virtue of admission to the allegations in the petition.” On April 15, 1997, the trial court signed a judgment containing this language and ordering that the children remain in the custody of OCS.
In adjudicating the children to be physically abused and neglected children in need of care, the trial court referenced in the judgment the “admission to the allegations in the petition.” The only “admission” from J.K. in the transcript of the continued custody hearing was that she responded, “No, sir,” when asked by the *119 trial court if she had any “problem with the children remaining in foster care until we can get to a hearing on that.” J.K. was not represented by counsel at the hearing, and she responded, “No, sir,” when asked by the trial court if she wanted a lawyer at that time. No evidence was presented on the issue of the adjudication, and the judgment was not appealed.
I/The May 1, 1997 hearing actually became a dispositional hearing. On that date, the trial court rendered judgment maintaining custody of the two children with OCS and approving the OCS case plan goal of reunification. The trial court signed a judgment to this effect on May 21, 1997. Thereafter, dispositional review hearings were held by the trial court on September 26, 1997, April 24, 1998, September 9, 1998, and September 8, 1999.
Prior to the September 26, 1997 disposi-tional review hearing, J.K. underwent a psychological evaluation by Dr. Sam Williams, a clinical psychologist. Specifically, Dr. Williams evaluated J.K. on May 14, 1997, and concluded that she was suffering from chronic depression, which had been present since childhood. According to Dr. Williams, J.K. was abandoned by her mother at the age of seven months and adopted at the age of two years. J.K’s adoptive father was physically abusive to her, and her mother was mentally and emotionally abusive. Additionally, Dr. Williams believed that J.K. was suffering from a chronic self-defeating personality disorder. According to Dr. Williams, J.K. “[had] come to believe that she kind of deserves the worst in life.” In terms of strengths, Dr. Williams found that J.K. was an intelligent, sensitive woman who had a legitimate concern for her children.
Using Dr. Williams’ evaluation conclusions, OCS authorized twelve therapy sessions with Dr. Ann Pittman Menou, another clinical psychologist. These occurred between July and December of 1997. In these sessions, Dr. Menou found that R.K. was J.K’s third husband and that her second husband was also abusive. J.K. missed only two of the sessions, and, when the sessions ended, she was making progress in facing her problems. Dr. Menou advised OCS that the twelve sessions were not enough, but OCS refused to authorize additional therapy.
IkAIso, prior to the September 26, 1997 dispositional review hearing, the children were placed under the care of Dr. Patricia D. Post, another clinical psychologist. Dr. Post saw the children together on July 3, 1997, and followed them individually through July, August and September of that year. She last saw K.K. on August 16 and C.K. on September 23.
At the September 26, 1997 dispositional review hearing, the trial court again rendered judgment maintaining custody of the two children with OCS and approving the OCS case plan goal of reunification. The trial court signed a judgment to this effect on October 6,1997.
In December of 1997, Dr. Menou began counseling with the children also. These sessions continued through July 1998. Additionally, sometime after the October 6, 1997 judgment, OCS changed its case plan goal from reunification to relative placement. The trial court approved this new case plan goal at the April 24,1998 hearing and continued the children in the custody of OCS. The trial court signed a judgment to that effect on May 5,1998.
At the September 9, 1998 dispositional review hearing, the trial court again approved the continued custody of the children with OCS as well as the case plan goal of relative placement. The trial court signed a judgment to that effect on September 17, 1998. This judgment, for the first time, ordered court-appointed counsel for J.K. By this time, the foster home placement of both children had been changed a number of times and both children were located more than one hour from Lake Charles, Louisiana, with K.K. in a foster home in Lafayette, Louisiana, and C.K. in Louis Infant Center in Houma, Louisiana, a group residential facility.
*120 OCS’s goal changed again after the September 17- judgment. In late November | fi1998, K.K. was transferred to a foster home in Marrero, Louisiana, near New Orleans. According to Dawn Mahoney Becton, the OCS worker assigned to the case since March of 1997, this move was accomplished in contemplation of the new foster family adopting K.K. Deanna Miles, a Gretna, Louisiana clinical social worker, began counseling K.K. on April 20, 1999, or after her transfer to Marrero. Ms. Miles testified that K.K. had been through four failed placements before the final move to Marrero and confirmed that the child had been told by the OCS worker that she would be adopted by her foster parents in Marrero.
Although OCS had obviously made the decision to terminate the parental rights of both R.K. and J.K. prior to the Marrero transfer, OCS did not file a petition to accomplish this termination until May 28, 1999. In that petition, OCS alleged that more than one year had elapsed since the children were removed from the parents’ custody pursuant to court order, that there had been no substantial parental compliance with case plans for services, that there was no reasonable expectation of significant improvement in the parents’ condition or conduct in the near future, and that the children were at an age where they needed a stable and permanent home.
The last dispositional review hearing prior to the trial on the termination issue occurred on September 8, 1999. This hearing resulted in a September 20, 1999 written judgment wherein the trial court maintained custody of the two children with OCS and approved the case plan goal of adoption.
In none of the dispositional review hearings, or in any other hearings before us, was a case plan filed into the record. La. Ch.Code art. 674 requires that the case plan be filed with the court at least ten days before the dispositional hearing.
The trial to terminate parental rights began on December 1, 1999, and resulted |7in the judgment at- issue in this appeal. The trial court’s ruling was reduced to a written judgment and signed by the trial court on January 5, 2000. The pertinent specifics of that judgment are as follows:
IT IS HEREBY ORDERED that all parental rights and obligations of [J.K.] and [R.K.]'to [C.K.] and [K.K.] are totally and irrevocably terminated in accordance with law.
IT IS FURTHER ORDERED that the minor children, [C.K.] and [K.K.], are available for adoption and until then, are to remain in the custody of the State, in their present placement, pending further orders of this court.
IT IS FURTHER ORDERED that the testimony of Deanna R. Miles, and [sic] expert witness, shall be transcribed and the transcription of that testimony shall be provided no later than December 31, 1999 to David Ritchie, court appointed counsel for [J.K.], and Mr. Rit-chie is ordered to provide copies of that transcript to friends and relatives of [J.K.] who are interested in making application for the adoption of [C.K.] and/or [K.K.].
IT IS FURTHER ORDERED that any friends and/or relatives of [J.K.] desiring to adopt [C.K.] and/or [K.K.] shall submit their applications for such adoptions to the Louisiana Department of Social Services by January 16, 2000. The Louisiana Department of Social Services may then consider those applications, along with any other applications, pursuant to its guidelines regarding adoption of children in its care.
IT IS FURTHER ORDERED ADJUDGED AND DECREED that all visits between [C.K.] and [K.K.] is [sic] suspended until such time that Deanna R. Miles recommends a renewal of such visitation.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that [B.B.] shall be permitted to visit with [C.K.] *121 and [KK] if such visitation is approved by Deanna R. Miles.
J.K. appeals, contending that the trial court erred in failing to appoint an attorney for her for more than two years prior to the filing of the petition to terminate parental rights; in terminating all of her parental rights, including her right to place her children with people she trusts so that she can keep the family relationships together; in holding that placement was not at issue in deciding what was in the best interests of the children in the termination of parental rights; and in finding that the department met its burden of proof to terminate her parental rights. Because we find 1 smerit in the assignments of error related to the appointment of an attorney and the sufficiency of the evidence to terminate, we pretermit addressing the remaining assignments of error.
OPINION
In all cases of involuntary termination of parental rights, there are two private interests involved: those of the parents and those of the children. State in the Interest of J.A., 99-2905 (La.1/12/00); 752 So.2d 806. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children that warrants great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the relationship between parents and their children. Id. On the other hand, children have a profound interest, often at odds with the interests of their parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in homes with proper parental care. Id. In balancing these interests, Louisiana courts have consistently found the interests of the children to be paramount of those of the parents. Id. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to children whose parents are unwilling or unable to provide adequate care for their physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process to terminate all parental rights and responsibilities and to achieve permanency and stability for the children. Id. The focus of such proceedings is not whether a parent should be deprived of custody of the child but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. Id. Thus, the primary | ¡¡concern of the courts and the state remains to secure the best interest for the child, which includes termination of parental rights where justifiable grounds exist and are proven. Id. Still, courts must proceed with care and caution because the permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. Id. The potential loss to the parents is grievous, perhaps even more so than the loss of their personal freedom resulting from incarceration. Id.
To assist the court in determining whether a parent is unwilling or unable to adequately care for a child’s physical, emotional, and mental health needs, La.Ch. Code art. 1015 provides the grounds for involuntary termination of parental rights. In an action to terminate parental rights, the petitioner bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La. Ch.Code art. 1035(A). When the trial court finds that the alleged grounds set out in any paragraph of La.Ch.Code art. 1015 are proven true by the evidentiary standard required by La.Ch.Code art. 1035 and that it is in the best interest of the child, it shall order termination of parental rights. La. Ch.Code art. 1037(A).
In the instant case, OCS filed the petition for termination of parental rights and based the petition on La.Ch.Code art. 1015(5), which provides:
*122 The grounds for termination of parental rights are:
[[Image here]]
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and 110permanent home.
OCS was authorized to file the petition by La. Ch.Code art. 1004(D), which provided at the time the petition was filed:
The department may petition for the termination of parental rights of the parent of the child when the child has been abandoned and termination is authorized by Article 1015(4), when as a result of a prior child in need of care disposition, termination is authorized by Article 1015(5), or when the child is in foster care because the parent is incarcerated and termination is authorized by Article 1015(6).
Despite the grounds for termination alleged by OCS, in terminating J.K.’s parental rights, the trial court based the termination on La.Ch.Code art. 1015(3)(i), stating the following in part:
The Court has heard a couple days of testimony in this and has read over all of the submissions by [J.K’s attorney], which certainly show a great deal of interest by [J.K.’s] family in trying to be of some help in this matter. The Court was particularly impressed with Ms. Miles’ testimony when she testified about the special needs of the children, particularly [K.K.]. And the Court’s concern, of course, is that those children can be where they can be best taken care of because the best interest of the children is what is supposed to be the Court’s responsibility.... I feel like that the cause of [J.K.’s] history of continuing to return to [R.K.], even after the termination of parental rights petition was filed, makes me know that it’s going to be difficult for her to be rehabilitated in the future because of her past history. And based on that, I feel like it’s the best interest of the children that the parental rights of [J.K.] and [R.K.] both be terminated....
... And I guess to make a specific finding on the grounds under which I find this should be done is under Children’s Code Article 1015, 3B],[1] which finds that, you know, there’s abuse or neglect which is life-threatening or gravely disabling, psychological injuries for the children. I think that’s obviously what happened and I think that since I don’t feel like that there’s any reasonable expectation of a significant improvement in [J.K.’s] condition or conduct in the near future that would allow the children to be returned to her is the basis upon which I terminate the parental rights.
_LyLa.Ch.Code art. 1015(3)(i) provides as a ground for termination:
(3) Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
[[Image here]]
*123 (i) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
La.Ch.Code art. 1003(10) defines neglect as:
[T]he refusal or failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is [sic] substantially threatened or impaired.
There is no evidence in the record that J.K. refused or failed to supply the children with necessary food, clothing, shelter, care, treatment, or counseling.
La. Ch. Code art. 1003(1) defines abuse as:
[A]ny of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction or attempted infliction, or, as a result of inadequate supervision, the allowance or toleration of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
(b) The exploitation or overwork of a child by a parent or any other person.
(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent or the caretaker of the child’s sexual involvement with any other person or of the child’s involvement in pornographic displays, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
Only Subparagraph (a) is relevant to the evidence presented at trial. Applying that provision, the only assertion of physical abuse in this case is that committed by 11?R.K.-there is no evidence of physical abuse by J.K.[2] Additionally, while there is conflicting evidence about whether R.K. had ever beaten the children before spanking them with the paint stick, there is no evidence that J.K. knew of any such incidents, and she specifically denied that R.K. had ever physically abused the children before the incident at issue. Further, J.K. was not even at the home at the time R.K. spanked the children with the paint stick, and, after her children were returned to her at the women’s shelter following the incident, she never returned to the home with the children. In fact, J.K. was the one who contacted law enforcement and child protection services following the incident. The record simply does not support a finding of infliction or allowance or toleration of infliction of physical injury upon the children by J.K.
Thus, the only remaining category of abuse under that Article concerning J.K. is the infliction or attempted infliction or allowance or toleration of the infliction or attempted infliction of mental injury upon children by a parent as a result of inadequate supervision. Regarding this category, there is no evidence that J.K. ever inflicted mental injury upon the children. Rather, the evidence establishes that J.K. loves her children and sought to protect them when she perceived that they were in danger. Dr. Williams testified about J.K.: “I believe that in many ways that she wants what’s best for her kids. I think this whole ordeal of a termination of her rights is just horrifying for her on the inside.” Dr. Menou was of the opinion that J.K. is concerned about her children’s welfare and wants 'them to be safe. The record also supports that the children love their mother. Dr. Post testified that the children indicated to her that they were close to their mother. Additionally, Dr. Menou |1sthought the children loved their mother and agreed that, when she saw the *124 children, they cared very much for their mother and were concerned for her.
However, the evidence does show that the children sustained mental injury through witnessing the violence by R.K. toward J.K. Ms. Miles testified that K.K. was diagnosed with attention deficit/hyperactivity disorder (ADHD), combined type; depressive disorder; anxiety disorder; and disruptive behavior disorder. According to Ms. Miles, at the time of her involvement with the child, K.K. was displaying abusiveness toward animals, angry behavior, antisocial behavior, “[s]ad” behavior, self-injurious behavior, hyperactive behavior, and oppositional behavior. She described K.K. as being attention seeking, argumentative, demanding, very impulsive, and very manipulative. Further, she reported that K.K. had difficulty with separation, tended to disassociate when under stress, was fearful, had a poor self-image, and had nightmares. As we appreciate her testimony, Ms. Miles was of the opinion that the abusive relationship between J.K. and R.K. resulted in K.K.’s present difficulties and behavior.
Dr. Post described the children as being “very traumatized” and “very disturbed” children. She testified that C.K. has a diagnosis of severe oppositional defiant behavior; general anxiety disorder; and ADHD, combined type. She described lying, destructive, and stealing behavior on the part of the children and explained that they had no restraint of impulses and exhibited cruelty to animals. Dr. Post testified: “The kids have been exposed to a lot of violence, and they have wounds from that.” She was of the opinion that the violent relationship with R.K. was a factor in the children’s behavior problems. However, she also concluded that some of the problems exhibited by the children were inherited. Regarding the ADHD | udiagnosis, she concluded: “[Tjhere [was] a genetic hereditary pattern there.... I suspect that both of these children have some heritable problems.” She went on to state that the children’s problems were “a combination of physiologically based difficulties and environmentally induced problems, and they have coalesced in this case to be quite severe.” She admitted that removal from J.K. “undoubtedly” was a factor in the children’s difficulties, but she also testified that the removal did not explain the degree of the children’s behavior.
Neither Ms. Miles nor Dr. Post ever interviewed J.K., and, while R.K. inflicted mental injury upon the children by abusing their mother in their presence, the evidence is not clear and convincing that J.K. allowed or tolerated that infliction as a result of inadequate supervision. Rather, J.K.’s testimony reveals efforts on her part to obtain help for herself through restraining and protective orders and through law enforcement. She ultimately sought protection at the women’s shelter and at the home of a friend. Ann Polak, the director of the shelter, stated in a letter introduced as an exhibit in these proceedings:
The usual support systems of family, employment, housing did not exist for [J.K.]. She began to focus on survival rather than planning as is typical of women who suffer from the effects of battering. Further complicating the situation was the fact that she felt alienated by the systems who were supposed to protect her.
Dr. Williams even related to the court J.K’s frustration with her inability to obtain assistance from law enforcement in dealing with her husband. It is our observation that J.K’s initiative in contacting child protection services to insure her children’s safety after she became aware of the risk to their safety speaks volumes on her supervision and care for her children. In speaking of the need for continued therapeutic support, Dr. Menou stated: “[J.K.] needs someone to ... be her advocate [ i ¡;and her ally in a sense to really encourage her to stay away from [R.K.] and to avoid contact with [R.K.].” Therefore, we find that the trial court erred in finding that abuse/neglect by J.K. had been established by clear and convincing evidence.
*125 However, in their appellate briefs, OCS, the district attorney, and the children’s attorney urge that grounds for termination of parental rights have in fact been established under La.Ch.Code art. 1015(5). As set forth above, the trial court did not base the termination of parental rights on that section of the Article, although it did make a factual finding on an element of that provision, i.e., that there was no reasonable expectation of significant improvement in J.K’s conduct in the near future that would allow the children to be returned to her. Because the trial court failed to make factual findings on all of the elements of La.Ch.Code art. 1015(5), we must address grounds for termination under that provision in a de novo review.
La.Ch.Code art. 1015(5) first requires that at least one year has elapsed since the children were removed from their parents’ custody pursuant to a court order. It is not disputed that more than one year has elapsed since the children were removed from their parents’ custody pursuant to the judgment adjudicating the children to be in need of care.[3] However, we interpret that requirement to mean a valid court order not obtained in violation of parental due process rights.
At the time of the child-in-need-of-care hearing, La.Ch.Code art. 647 allowed a parent to stipulate that his or her child was a child in need of care, provided that (1) the parent personally appeared before the court; (2) the court fully informed the parent of his or her rights as required by La.Ch.Code art. 625, which included the |! firight to be represented by an attorney and to have one appointed; (3) the court fully informed the parent of the consequences of such stipulation; and (4) the parent knowingly and voluntarily consented to the judgment. Comment-1991(b) to that Article provides in part: “The requirements of this article seek to insure that the due process rights of parents are honored.” Further, La.Ch.Code art. 608 provides:
A. The parents of a child who is the subject of a child in need of care proceeding shall be entitled to counsel, which right may be waived by the parents.
B. If the parents of a child are financially unable to afford counsel, the court shall appoint counsel, or refer the parents for representation by the indigent defender board.
Comment-1991 to that Article provides in part:
This article does not change the law. Under the Louisiana Constitution, due process requires appointment of counsel to represent indigent parents in a neglect proceeding when the state seeks to remove the child from the custody of his parents for an indefinite or prolonged period of time, unless the right to counsel is knowingly and intelligently waived. In the Interest of Howard, 382 So.2d 194 (La. App. 2d Cir.1980).
The court in In the Interest of Howard, 382 So.2d 194, 199-200 (La.App. 2 Cir. 1980), stated:
Considering the fundamental and constitutional right of parents to the custody and control of their children, the adversary nature of abuse/neglect custody proceedings which involve charges of conduct which may give rise to criminal prosecution, the grievous nature of the loss which parents face through indefinite or prolonged separation from their child, and the imbalance of the power and ability of the state to present its side of the case as opposed to that of the parents, we hold that a minimum standard of due process under both the federal and state constitutions requires that *126 counsel be furnished at state expense to indigent parents faced with charges of neglect and the possibility of removal of their child from their custody for an indefinite or prolonged period of time, unless the parents knowingly and intelligently waive their right to counsel. Necessarily implicit in this holding is that the parents be advised of their right to counsel.
In the instant case, the following colloquy occurred at the adjudication hearing, Jjjwhich was labeled as a “continued.custody hearing and arraignment” in the minutes: [4]
[ATTORNEY FOR OCS]:
Your Honor, State of Louisiana in the Interest of [C.K.] and [K.K.]—it’s permanent docket number 13534—before the Court today as a result of an instanter order issued by the Court last Thursday. Present in court at this time is the mother of the children, [J.K.]. The father is where?
[OCS WORKER]:
He’s at work. I think he had to go to work in DeQuincy. We spoke to him yesterday. He doesn’t have a problem with [sic], but he’s just not here.
[ATTORNEY FOR OCS]:
It’s our understanding at this time, Your Honor, that the mother is going to enter an admission to the allegations of the State’s petition regarding the issuance of an instanter order, and has no objection to the child [sic] being in foster care pending further trial on the merits.
THE COURT:
[J.K.], do you understand you have a right to have a lawyer?
[J.K.]:
Yes, sir.
THE COURT:
You don’t want a lawyer at this time?
[J.K.]:
No, sir.
THE COURT:
Do you understand this petition?
[J.K.]:
Yes, sir.
THE COURT:
You have no problem with the children remaining in foster care until we can get to a hearing on that?
[J.K.]:
No, sir.
|1RTHE COURT:
Then I’ll go ahead and continue the children in care at this time and set the matter.
[ASSISTANT DISTRICT ATTORNEY]:
May 1st at 1:30, Your Honor.
THE COURT:
Okay. We’ll come back May the 1st.
[ATTORNEY FOR OCS]:
Judge, could we have the court enter an admission or a denial on behalf of the parents, and I’m uncertain as to whether they qualify for court-appointed counsel.
THE COURT:
Well, they don’t—she doesn’t—•
[OCS WORKER]:
Well, the father—well, the father yesterday is basically saying—the father—
THE COURT:
I don’t care what the father wants. He ain’t here and—
[OCS WORKER]:
Yeah, he doesn’t have a problem with it, you know, so, he’s just not here.
THE COURT:
So, I’m entering a denial—I’m entering an admission.
[OCS WORKER]:
Yeah, because he didn’t have a problem with it. Yeah.
THE COURT:
*127 I’m entering an admission, not a denial, on both.
[ATTORNEY FOR OCS]:
Your Honor, we move to set this matter for May 1 at 10 a.m.
[ASSISTANT DISTRICT ATTORNEY]:
No, 1:30.
[ATTORNEY FOR OCS]:
1:30. That’s right. May Day.
|19DEPUTY CLERK:
What kind of hearing are we on?
[OCS WORKER]:
Seventy-two.
[ATTORNEY FOR OCS]:
No, this is a seventy-two hour hearing. Another one on May the 1st. On May the 1st. If they’re admitting, it’s going to be the dispositional—
THE COURT:
It’s dispositional.
[ATTORNEY FOR OCS]:
—recommendation at that time. Thank you, Your Honor.
[OCS WORKER]:
Thanks.
THE COURT:
All right.
This is the hearing that resulted in the judgment adjudicating the children to be physically abused and neglected children in need of care, which judgment was rendered on the same day the petition for the adjudication was filed and just six days after J.K. voluntarily sought the assistance of OCS in protecting her children. It appears from the colloquy that the trial court initially treated the hearing as a continued custody hearing under La.Ch.Code art. 624, but, later in the colloquy, the court entered an admission [obviously to the petition for adjudication since that is the judgment that resulted therefrom] and labeled the next proceeding that would take place as a dispositional hearing. Even the deputy clerk inquired into the nature of the hearing during the colloquy. We would have been hard-pressed to discern exactly what transpired had we not had the benefit of reviewing the judgment resulting from the proceeding. Most importantly, it is not clear that J.K., who has only an eleventh-grade education and a G.E.D., understood the nature of the proceedings or that she lleven stipulated to the adjudication. In fact, the only admission she made on the record was that she had “no problem with the children remaining in foster care until we can get to a hearing on that [the petition].”
Moreover, even assuming she did stipulate to the adjudication, it is clear that the court failed to inform J.K. of the consequences of the stipulation as required by La.Ch.Code art. 647(3). Furthermore, the record contains no attempt by the trial court to ascertain whether J.K.’s waiver of counsel was knowingly and intelligently made, other than its question to J.K.: ‘You don’t want a lawyer at this time?” We perceive that, due to the exigency of the circumstances, the trial court, OCS, and J.K. were trying to quickly insure the protection of the children. However, it is simply not clear that J.K. understood either the adversarial nature of the adjudication proceedings or the implications such an adjudication would have for the future. In fact, she testified that she never had any idea when she was seeking help from OCS that she would not get her children back and that OCS would attempt to terminate her parental rights. She also testified that if she had to do it over again, she would not have done the same thing. Thus, we find that the adjudication judgment was rendered in violation of J.K’s due process rights and is therefore not a valid order. Even though J.K. did not appeal the adjudication judgment, we find it necessary to inquire into its validity since a valid order is a prerequisite for termination under La.Ch.Code art. 1015(5), the basis for termination of rights urged on appeal by OCS, the district attorney, and the attorney for the children.
*128 Under La.Ch.Code art. 1039, if the court finds that the grounds for termination are not proven in accordance with the evidentiary standards set forth in La. Ch.Code art. 1035 or if the courts finds that termination of parental rights is not in the best [¡^interest of the child, the court may (1) dismiss the petition; (2) reinstate the parent to full care and custody of the child; (3) reinstate child-in-need-of-care proceedings pursuant to Title VI, if the child has been previously adjudicated as a child in need of care; (4) adjudicate the child in need of care in accordance with Title VI, upon a showing of sufficient facts; (5) adjudicate the family in need of services in accordance with Title VII, upon a showing of sufficient facts; or (6) make any other disposition that is in the best interest of the child. '
The disposition of this case is extremely problematic because of “potentials.” On the one hand, we have found that the grounds for termination were not proven. Further, the evidence shows that there is love and concern between J.K. and her children and demonstrates a strong desire and commitment by J.K. to protect her children from what she perceives to be abuse to them. Moreover, Ms. Miles conceded that it is “[mjuch preferable” for the child to be with the natural parent if there is no physical or sexual abuse or neglect. As we previously stated, there has been no physical or sexual abuse or neglect of the children by J.K. While we note that Ms. Miles testified that J.K’s visitation with K.K. “seemed to have contributed to a regression in her behavior,” we also note that this regression occurred within the time frame of the placement of K.K. in her current foster situation and of someone with OCS informing K.K. that she was placed in that home for purposes of adoption. In any event, Dr. Menou reported that allowing the children to maintain their relationship with their mother did not negatively impact their functioning. We are hard-pressed to fathom that the best interests of the children would be served by severing J.K’s parental ties with them under the circumstances of this case.
On the other hand, unfortunately, J.K. engaged in a pattern of returning to R.K. | rafter the children were out of her custody. In fairness to J.K., she was under the impression initially that OCS was encouraging the reconciliations, but OCS clarified its position to her. Moreover, Dr. Williams testified that J.K. “was very, very aware that ... there was a heavy contingency between her own assessment of her readiness to get them back ... and her relationship with [R.K.] and keeping him out of her life.”
Ms. Miles testified that K.K. needs stability and needs to feel safe. She also testified that it would be “[vjery, very important” that K.K. not witness violence toward a caretaker at this point and that “[i]t would be very detrimental to her” to be placed in an environment where her caretaker was the subject of physical abuse. Ms. Miles further explained that the studies indicate that it is not common for abused women to leave at the very first violent attack and that often they endure many attacks prior to leaving. She also appeared to be of the opinion that, even after leaving, the abused woman will ultimately return.
Dr. Post was of the opinion that the children need stability and permanency and stated that it would be “crucial” for the children to be free from violence. She testified that her only concern was that J.K. continued to go back to R.K., and she explained: “[Tjhe/re already so traumatized that exposing them to more of that possibly seems to outweigh the fact that they might be able to be with her ... because they’re so disturbed.... ” Dr. Post testified that “[fit’s not an uncommon pattern to repeatedly go back [into an abusive environment] for lots of reasons.”
Dr. Williams was also of the opinion that the children need security and stability. He diagnosed J.K. as having a “self-defeating personality disorder,” which he described as a “habitual and entrenched pat *129 tern of behaving, thinking, [and] feeling” in which the person “chronically ... sabotages their [sic] own good fortunes. | pjjThey continually shoot themselves in the foot ... and have a hard time maintaining a healthy, happy, harmonious type of life.... ” Dr. Williams did not think that it would be reasonable for the children to return to J.K. until there was “good reason” to believe that she had changed. He was of the opinion that there would have to be a year of intensive treatment plus a year of being stable and away from the violence before there could be a consideration of returning the children to her.
Dr. Menou testified that her main concern for the children would be that they not return to J.K. because J.K. may continue the relationship with R.K. and the children would be subject to the same abusive environment that they were in initially. Dr. Menou explained that, typically, with battered women “there is some length of time where there’s [sic] separations and reunifications,” and she felt the prognosis for J.K. remaining away from her husband was poor.
The fact that we find that OCS did not carry its burden for termination of J.K’s parental rights by clear and convincing evidence does not suggest that we conclude the children should be returned to her. Because of J.K’s problems, which need to be addressed through therapy, immediately returning the children to her would probably set her up for failure and thus set the children up for further upheaval. However, we do not feel that the facts justify adjudicating the children to be in need of care vis-a-vis their mother, since she did not perpetrate or tolerate abuse or neglect of her children. Further, as stated above, we do not find that it has been established by clear and convincing evidence that it would not be in the best interests of the children to be totally cut off from contact with their mother under the facts presented.
We note that Comment-1999(c) to La. Ch.Code art. 1015 provides in part:
42 U.S.C. 675(5)(E) now requires the state department to file a petition to terminate parental rights when the child has been in foster | ^care under the responsibility of the state for fifteen of the most recent twenty-two months or if a court has found that any of those aggravated circumstances exists.
The children have been in foster care for fifteen of the most recent twenty-two months. However, Comment-1999(c) further explains that there are three exceptions to this mandate under 42 U.S.C. § 675(5)(E):
[I]f the child is being cared for by a relative; if the department has documented in the case record a ‘compelling reason’ that termination of parental rights is not in the best interests of the child; or that the department has not provided necessary services for the safe return of a child when reasonable efforts to reunify a family are required.
First, we have not found that OCS adequately provided necessary services for the safe return of the children. Dr. Me-nou’s opinion concerning J.K’s need for continued therapy to overcome her problems was expressed to and basically ignored by OCS, despite the fact that J.K. was referred to Dr. Menou by OCS. Dr. Menou testified that J.K. made progress at various times during the course of her therapy and that “[s]he also made progress regarding being able to leave [R.K.], and at one point, apparently after planning and making some plans for herself to get away from [R.K.], she was able to separate with him.” Dr. Menou testified that the twelve sessions authorized by OCS were in no way sufficient to address J.K’s problems and that she would need long-term assistance and support if she were ever to break the cycle of abuse in her life. Despite this recommendation, OCS rejected further therapy. According to Ms. Becton, the twelve-session restriction was placed in advance of Dr. Menou’s treatment by a “consultant [who has] a masters degree in social work who approves or does not ap *130 prove of a number of sessions.” In other words, a person who is not a psychologist made an arbitrary decision in advance that J.K.’s therapy needs would be limited to twelve sessions. Furthermore, we are not impressed with Ms. |2BBecton’s suggestion that she offered to refer J.K. to another organization for further counseling. Ms. Becton took no steps to determine whether such therapy was available or the cost of the continued treatment for J.K., although she had clients in the past who attended “counseling sessions ... for as little as $2.00 per session.” There is no evidence that these “counseling sessions” would have equated to the care being administered by Dr. Menou. Further, J.K., who earns minimum wage when working, testified that “it was near impossible for [her] to do every single thing they wanted [her] to do and secure a job and make [herself] safe.... [I]t was almost impossible.” We find that the twelve therapy sessions authorized by OCS and its suggestion that J.K. might be able to obtain inexpensive counseling were inadequate steps toward discharging OCS’s responsibility of providing necessary services for the safe return of the children, especially where the only issue preventing reunification was J.K.’s problem of returning to her husband and where J.K. was making progress in therapy-
We find that under the unique facts of this case, and pursuant to our authority under La.Ch.Code art. 1039(6), the best interests of the children would be served by remanding the case to the trial court to determine placement of the children with relatives. Relative placement would provide an exception to the requirement of 42 U.S.C. § 676(6)(E) that OCS file a petition to terminate when the children have been in foster care under the responsibility-of the state for fifteen of the most recent twenty-two months. Thus, procedurally, a longer period of foster care would be permissible and allow J.K. time to receive the treatment she needs so that she and the children might be reunited.
Importantly, letters from relatives introduced into evidence demonstrate a | ^desire, ability, and commitment to receive and care for the children. Jy.F., J.K’s oldest child and the half-brother of C.K. and K.K., submitted a letter expressing his desire and ability to provide a home for the children. He works for the fire department, and his wife was to begin teaching after her graduation from college in May at the time Jy.F. wrote the letter. Jy.F. and his wife have a child who is four months younger than K.K., and they recently purchased a new home. Furthermore, Jy.F.’s paternal aunt, S.C., submitted a letter expressing her desire and the desire of her husband to share their home with K.K. J.K’s oldest daughter and the children’s half-sister, Jr.F., lives in S.C.’s garage apartment. The children have spent time with S.C. and her husband, and she and her husband were certified as foster parents in 1992 and have six years of combined experience working at a juvenile facility for troubled youth. Additionally, Jy.F.’s and Jr.F.’s other paternal aunt and S.C.’s sister, S.K., submitted a letter expressing her desire and the desire of her husband to share their home with C.K.
It is abundantly clear that the children need stability in their lives. However, it does not appear that the children have had much location stability so far, with K.K. having been in five foster homes and C.K. having been in at least one foster home with K.K. and in a residential facility, apparently because of the children’s behavioral difficulties. Thus, relative placement would not represent a drastic uprooting for the children. Additionally, relative placement would allow the children and J.K. the opportunity to continue their relationships with one another and allow J.K. to show the love and affection to her children that she desires and that they need. With access to the children through family, we would anticipate that the atmosphere would not be as stressful and charged as it seems to have been when OCS was controlling and | ^limiting the visits.
*131 While we reverse the trial court’s decision to terminate J.K’s parental rights at this time, we do not mean to suggest that termination of those rights might not ultimately be required in the future. We merely hold that at this time the heavy clear-and-eonvincing burden of proof has not been met.
DISPOSITION
For the foregoing reasons, we reverse the judgment of the trial court terminating J.K’s parental rights and remand for further proceedings to determine relative placement with continued contact between J.K. and the children. We affirm the termination of R.K’s parental rights, having not considered the merits thereof in light of his failure to appeal. We assess costs of this appeal to the State of Louisiana, Department of Social Services, Office of Community Services in the amount of $225.00 in accordance with La.R.S. 13:5112(A).
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

. These reasons for judgment actually provide the basis for the termination as being La.Ch. Code art. 1015(3)(h)-that provision was redes-ignated as La.Ch.Code art. 1015(3)(i) by Acts 1999, No. 449, § 1, and it is clear from the court’s tracking of the language of 1015(3)(i) that it intended to base the termination on that provision.

. Because R.K. has not appealed the termination of his parental rights, we are not called upon in this case to determine the line between parental abuse and proper parental discipline.

. We do not consider the instanter order to be the order contemplated by La.Ch.Code art. 1015(5) because it was merely a noncontrad-ictory emergency order. Additionally, the dispositonal judgments were predicated on the adjudication judgment. See La. Ch.Code art. 681(A) (listing dispositional alternatives in cases in which the child has been adjudicated to be in need of care).

. We note that the judge who presided in these adjudication proceedings is not the same judge who presided in the termination proceedings.